# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
# AT KNOXVILLLE
Assigned on Briefs October 13, 2015

## STATE OF TENNESSEE v. ZACHARY JAMES PENCE

**Appeal from the Circuit Court for Anderson County
Nos. A9CR0736, B1C00646      Donald R. Elledge, Judge**

_____

## No.  E2015-00476-CCA-R3-CD – Filed February 22, 2016

_____

The Defendant, Zachary James Pence, was found guilty by an Anderson County Circuit Court jury of aggravated rape of a child, a Class A felony, aggravated child abuse, a Class A felony, and child abuse, a Class D felony.  *See* T.C.A. §§ 39-13-531 (2014), 39-15-402 (2010) (amended 2011, 2012), 39-15-401 (2010) (amended 2011).  The trial court sentenced the Defendant to concurrent terms of sixty years for the aggravated rape of a child conviction, twenty-five years for the aggravated child abuse conviction, and two years for the child abuse conviction. On appeal, the Defendant contends that (1) the evidence is insufficient to support his convictions, (2) the trial court erroneously permitted inadmissible hearsay evidence, (3) the trial court improperly commented on the evidence, (4) the trial court permitted improper opinion testimony, (5) the trial court improperly instructed the jury, (6) his sentence for the aggravated rape of a child conviction is excessive, and (7) the cumulative effect of the errors entitle him to relief.  We affirm the judgments of the trial court.

## Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and TIMOTHY L. EASTER, JJ., joined.

J. Thomas Marshall, Jr. (on appeal), District Public Defender, and Leslie Hunt (at trial), Clinton, Tennessee, for the appellant, Zachary James Pence.

Herbert H. Slatery III, Attorney General and Reporter; Ahmed A. Safeeullah, Assistant Attorney General; David S. Clark, District Attorney General; and Victoria Elizabeth Bannach, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

In this case, the Defendant was indicted for aggravated child abuse and aggravated rape of a child of his then-girlfriend's three-year-old daughter, A.F., and child abuse of the Defendant's then-girlfriend's eighteen-month-old son, B.F.[1] The offenses occurred in July 2009 while the Defendant cared for the children when their mother was at work.

At the trial, the victims' mother testified that A.F. was born on November 6, 2005, and that B.F. was born on May 11, 2008. The victims' mother stated that she and the Defendant began a romantic relationship near the end of 2008 and that the Defendant began living with her and the children around February 2009. The victims' mother said that in July 2009, she worked at a convenience store and that she usually worked the day shift. She said the children did not have any injuries when she put them to bed on July 18, 2009, and that nothing unusual occurred during the night. She said that on July 19, 2009, she worked the day shift from 7:00 a.m. to 2:00 p.m. and that the Defendant cared for the children while she was at work because her usual babysitter was unavailable.

The victims' mother testified that on July 19, the children were asleep when she left for work, that she woke the Defendant to tell him she was leaving, and that she asked the Defendant to call her when the children woke, which was usually by 9:00 or 9:30 a.m. She said that the Defendant had not called her by 10:00 a.m., that she called the Defendant to check on everyone, and that the Defendant said the children were still sleeping. She said that about thirty minutes later, the Defendant called to tell her that the children were awake. The victims' mother called the Defendant during her break to talk to the children, and the Defendant stated that he was preparing the children's breakfast and that A.F. was not feeling well. The victims' mother spoke to A.F., who was crying and wanted her mother to come home. The victims' mother said that the children were recovering from a viral infection and that she called the Defendant's mother, Ruby Miller, and requested she visit the children and administer their medications. Although the victims' mother did not recall the time, she received a text message from the Defendant stating that the children were sick and that the victims' mother needed to come home. She called the Defendant's cell phone but spoke to Ms. Miller, who stated that A.F. looked "extremely sick" and had a puffy face and lips and that A.F. needed to go to the hospital.

The victims' mother testified that she left work as soon as her manager allowed, that she attempted to obtain additional information from the Defendant on her way home, and that the Defendant thought A.F. might have had an allergic reaction to the medication, although he was unsure. When the victims' mother arrived home, she saw that A.F.'s face appeared to

---

[1] It is this court's policy to refer to minors and victims of sexual assault by their initials.

be "swelling from her lips out[ward]." She said that A.F. had "little purple blue dots" on her lips and small, light-colored bruises on her cheeks and around her mouth. After examining A.F., the victims' mother examined B.F., who whined when she picked him up. The victims' mother saw that B.F.'s face and lips were slightly swollen. The victims' mother asked the Defendant if he had administered the victims' medications, and the Defendant said he had not. She called Ms. Miller, who stated that she did not administer the medications earlier because she feared allergic reactions. The victims' mother said that the children received their last doses of medication the previous night around bedtime, that she did not notice any allergic reactions, and that at least nine or ten hours had passed since their last doses. The victims' mother said that A.F. had no known allergies at the time of the incident. Ms. Miller drove to the family home and drove the victims' mother and the children to the children's hospital.

The victims' mother testified that while she waited for Ms. Miller to arrive, the victims' mother dressed the children. Relative to A.F., the victims' mother took A.F. to use the bathroom and heard A.F. say her "pee-pee hurt[]." The victim's mother thought A.F.'s viral infection might have developed into a kidney or urinary tract infection. The victims' mother said that A.F. changed from her pajamas to regular clothes but did not change her underwear. Although A.F. acted as though she did not feel well, the victims' mother said A.F. did not appear scared. Relative to B.F., the victims' mother changed his diaper and noticed a "break in the skin" on the rear thigh near the buttocks. She said the mark was light red, long, and "kind of like a loop" but not a full circle.

The victims' mother testified that after Ms. Miller drove her and the children to the children's hospital, she noticed A.F. had a light-colored bruise on the back of her thigh. Upon further examination, the victims' mother saw that the bruise "steadily climb[ed] up the back," reaching the "crease" of her buttocks. The victims' mother said the bruise was gradually turning colors, although she did not notice the bruise before arriving at the hospital. The victims' mother advised the hospital nurse that A.F. was developing additional symptoms. After being placed inside an examination room, the victims' mother noticed that the corner of A.F.'s eye was red, almost bloodshot, and that the redness gradually increased to one-half of the eye.

The victims' mother testified that the physician requested permission to speak with A.F. alone, that the physician and A.F. left the room momentarily, and that they returned. The physician ordered a CAT scan of A.F.'s head relative to her eye and ordered blood tests for each child. The nurses asked the victims' mother about A.F.'s bruises, and the victims' mother stated that the bruises were not present when she left for work that morning or when they left home for the hospital. The victims' mother also told the nurses that the Defendant cared for the children while she was at work that day.

The victims' mother testified that the nurses requested A.F. provide a urine sample for analysis and that the victims' mother took A.F. to the bathroom to obtain the sample. She said that after A.F. pulled down her underwear, the victim's mother saw dried blood spots on the area of the underwear that covered A.F.'s private area. The victims' mother did not notice blood in A.F.'s urine sample. The victims' mother informed the nurses of the blood, and a nurse examined A.F.

The victims' mother testified that the physician asked A.F. various questions about the injuries and that A.F. answered the questions. The victims' mother later learned about A.F.'s statements to the physician when they spoke outside the victims' mother's presence. The victims' mother said she was shocked, upset, and confused. She said that a detective entered the examination room and requested permission to speak to A.F. alone and that the victims' mother consented. The detective and A.F. spoke for about twenty minutes, and they returned to the examination room. The victims' mother said Sarah Powell from Child Protective Services (CPS) also spoke to A.F. alone. After Ms. Powell and A.F. returned, the victims' mother and Ms. Powell spoke outside the children's presence. The victims' mother stated that she told Ms. Powell the Defendant had been home with the children, and they discussed the children's injuries and their previously contracting a viral infection. The children were sent to live temporarily with their maternal great-grandmother.

The victims' mother testified that while various individuals spoke to A.F., the victims' mother saw red marks on B.F.'s face, which were not visible when they left home for the hospital, and said that the mark on B.F.'s leg began to bruise. The victims' mother said that she sent the Defendant text messages around 8:00 or 9:00 p.m. and that she suggested he come to the hospital to talk about what occurred while she was at work. She told the Defendant that the hospital staff thought the children had been abused. She said the Defendant arrived at the hospital approximately one hour after the exchange of text messages.

The victims' mother identified photographs taken at the children's hospital of A.F.'s and B.F.'s injuries. The photographs showed A.F. had a "bloodshot" left eye, purple-colored bruises around the mouth, lips, cheeks, and forehead, and scratches on and below the nose. The victims' mother noted A.F.'s face and lips were swollen. Photographs also showed bruises and "purple and red striped marks" across A.F.'s buttocks and upper right thigh. Other photographs showed a red substance on the vaginal area of the underwear A.F. wore to the hospital. Relative to B.F., photographs showed "red blotches" on the nose, cheeks, forehead, and the area around the eyes. The victims' mother noted that B.F.'s face appeared swollen at the bottom of the nose and the cheeks. Other photographs showed red marks on B.F.'s upper right thigh and buttocks.

The victims' mother testified that after she left for work on July 19, only the Defendant and Ms. Miller had contact with the children and that the Defendant did not mention anyone else being inside their home.

The victims' mother testified that she left the hospital with Ms. Miller around 1:00 a.m., that Ms. Miller drove her home, and that the Defendant stayed overnight with Ms. Miller. The victim's mother drove to the sheriff's office later that morning to speak to the investigating detective, and the Defendant went with her. She said that her home was two houses down the street from Ms. Miller's home, that she walked to Ms. Miller's home, that the Defendant was lying on the sofa, and that he agreed to talk to the detective. The victims' mother said that before they left Ms. Miller's home, the Defendant told her that he spanked A.F. with a belt and that he touched her buttocks but not "in a sexual way." The victims' mother said that at the time, she only knew A.F. "had been touched" in her vaginal area, not the details of the contact. She said the Defendant told her that he did not touch A.F. in the manner the medical personnel and detective said A.F. had been touched. The victims' mother said she was in shock and asked the Defendant why he spanked A.F., although the victims' mother did not recall the Defendant's answering the question initially. The victims' mother said the Defendant denied hurting B.F. She asked the Defendant why he would hurt a baby, and the Defendant told her that "it was like [he] blacked out." She said that the Defendant admitted what he did was wrong and recalled the Defendant's stating A.F. was "being bad and not listening."

The victims' mother testified that she, the Defendant, Ms. Miller, the Defendant's sister, and the Defendant's niece drove to the sheriff's office to speak with the detective. The victims' mother reported to the detective the substance of the Defendant's admissions while at Ms. Miller's house earlier that morning. After the victims' mother, the Defendant, and Ms. Miller provided their statements to the police, they left the sheriff's office and returned to their respective homes.

The victims' mother testified that she next spoke to the Defendant two days later and that the Defendant said that he did not know why he "did it," that he blacked out, that he loved the children, and that he would not hurt them. The victims' mother asked the Defendant about his touching A.F., and the Defendant stated that A.F. complained of pain when she urinated, that he examined A.F. to ensure she did not have diaper rash, and that he placed his finger on A.F.'s private area and opened her legs to ensure nothing was irritating A.F. The victims' mother said the Defendant never stated he inserted his finger in A.F.'s vagina. The victims' mother said she spoke to the Defendant at a later date and recalled the Defendant's telling her that he and Ms. Miller were the only individuals in the house with the children while the victims' mother was at work. The victims' mother said that she initially believed the Defendant's version of the events because she did not think the Defendant was

-5-

capable of abusing a child. She said, though, that at the time, she had not seen all the evidence or spoken to A.F. about the incident.

On cross-examination, the victims' mother testified that at the time of the trial, she did not have custody of the children, that the juvenile court ordered her not to have contact with the children, and that the no-contact order had been effective since August 20, 2009. She agreed that at the juvenile court hearing, she testified that the Defendant was not guilty. She agreed her initial belief that the Defendant was not capable of the allegations was one of the reasons she had not regained custody of the children.

The victims' mother testified that she wrote to the Defendant after his arrest. She agreed that she initially was concerned about a neighbor being inside her home when she was not there. She said she learned after the Defendant's arrest that the neighbor possibly had a previous child molestation conviction. She noted the neighbor had been inside in her home and had brought A.F. gifts. The victims' mother recalled that about eight days before she took the children to the hospital for the viral infection, she saw fingerprints on the outside of her daughter's bedroom window and became concerned someone had entered her home through the window.

The victims' mother testified that when she arrived home on the day of the incident, she thought the victims' injuries were related to the viral infection. She agreed the Defendant initiated the first telephone call to his mother on the day of the incident and expressed concern about the victims. She agreed that although the Defendant had not cared for both children simultaneously before the incident, the Defendant had watched one of the children many times and that no problems arose. She agreed A.F. and the Defendant appeared to have a good relationship. Relative to the day of the incident, the victims' mother agreed A.F. and the Defendant did not act unusual and noted A.F. did not appear scared of the Defendant. The victims' mother agreed that the Defendant said he had spanked A.F. with a belt, although he did not state the number of times, because A.F. was misbehaving and not listening to the Defendant.

On redirect examination, the victims' mother testified that after she read the Defendant's statement to the police, she no longer believed the Defendant's version of events. Relative to the fingerprints outside A.F.'s bedroom window, she said that although she did not know who left the fingerprints, she knew the person was an adult based on the size of the hand. She said that the day of the incident was the first time the Defendant cared for both children while she worked all day. She said that the previous times in which the Defendant cared for the children were for short periods of time. The victims' mother noted the children usually attended daycare and said she usually did not work on weekends.

The victims' mother testified that she did not spank her children and that the children were disciplined with time out or the loss of television privileges. She had discussed her method of discipline with the Defendant. She said that at the time of the incident, B.F. could not talk, although A.F. could talk and referred to the Defendant by his name.

A.F. testified that she was six years old and that she had recently finished kindergarten. She identified an anatomical drawing of a female and identified the buttocks as an area for "bad touches." She also identified the vaginal area, which she referred to as her "private part," as an area for bad touches. When asked if anyone had touched her in a good or bad place, she said that she forgot. She said, though, that she did not want to talk about bad touches because she was scared. A.F. refused to answer any further questions because she was afraid.

Ruby Miller, the Defendant's mother, testified that she vaguely remembered the Defendant's dating the victims' mother and that she did not recall taking the victims and the victims' mother to the children's hospital on July 19, 2009. When presented with her statement to the police, she did not recall telling the detective that the Defendant admitted he had touched and spanked A.F. and that the Defendant said he "blacked out or something." Ms. Miller said that she had not spoken to the Defendant much since his arrest.

CPS Investigator for the Department of Children's Services (DCS) Sarah Powell testified that after arriving at the children's hospital, she spoke to the treating physician and to A.F. Ms. Powell noted A.F.'s injuries previously identified by the victims' mother and identified a photograph showing scratches and bruises on the victim's neck and shoulder. Ms. Powell said the bruises looked similar to finger marks.

Ms. Powell testified that she conducted a forensic interview with A.F., that Ms. Powell's questions depended upon A.F.'s answers, and that A.F. identified the Defendant as the person who hurt her. Ms. Powell said that the interview lasted about ten minutes and that the victim provided clear answers. Ms. Powell spoke to the victims' mother and afterward, took the children to stay with a relative pending a juvenile court hearing held three days later.

Ms. Powell testified that she examined B.F. and observed "red dots, petechial or something" on his face and a "whelp-like shape on his side," which she said was red, "fresh," and recently inflicted. She noted the mark was not in the bruising stage. After she examined B.F., she and the Defendant discussed the day's events.

Ms. Powell testified that the Defendant understood she was investigating A.F.'s facial swelling. The Defendant said that he called the victims' mother and requested the victims' mother take A.F. to the doctor's office. The Defendant said that he was aware A.F. had a

vaginal tear, although he did not know what caused it. Ms. Powell told the Defendant that he needed to be honest and that a limited number of people could have caused the tear. She said the Defendant responded, "[W]hat happens if I did, will I go to jail?" Ms. Powell told the Defendant that she was not a police officer and that her job was to learn what happened and to obtain the proper medical treatment. The Defendant told Ms. Powell, "[L]et's just say I did it." Ms. Powell asked the Defendant if he caused the injury, and the Defendant answered in the affirmative.

Ms. Powell testified that the Defendant said he used his left pointer finger and bent it back and forth when asked to describe what he had done. He said that while A.F. was lying on her back, he inserted his hand in A.F.'s pull-up diaper. Ms. Powell said that although the Defendant did not say whether he touched or penetrated A.F.'s vagina with his finger, the Defendant said it lasted about "two seconds . . . before he realized it was wrong." Ms. Powell asked the Defendant how far he inserted his finger, and the Defendant attempted to give a measurement on his finger indicating how far he thought his finger had entered A.F.'s vagina. When Ms. Powell asked the Defendant what he was thinking, he told her that he was "just curious."

Ms. Powell testified relative to the markings on A.F.'s buttocks that the Defendant initially denied spanking A.F. but later admitted he spanked A.F. with a belt and a fly swatter because A.F. was spitting and would not return to sleep. The Defendant told Ms. Powell that he instructed A.F. to bend over the side of the bed before spanking her. The Defendant denied noticing any blood on his hands or the bed afterward and did not respond when Ms. Powell asked the Defendant if he placed anything over A.F.'s face. Ms. Powell noted that the Defendant appeared scared and "uptight" before telling her what occurred. She said that although the Defendant relaxed after he told her what occurred, he showed no emotion and only showed concern about what would happen to him.

On cross-examination, Ms. Powell testified that the victims' mother was not permitted to have any contact with the victims because she failed to protect them. Ms. Powell noted that the victims' mother did not believe the Defendant caused the injuries and that returning the children to the family home would not have ensured their safety. Ms. Powell denied threatening the Defendant with jail if he refused to talk to her. She said the Defendant did not tell her to "put down whatever [she] wanted and he would just go along with it." Ms. Powell said that she and Detective Danielle Alexander observed A.F.'s forensic interview. On redirect examination, Ms. Powell testified that although A.F. provided additional information during the forensic interview, A.F. did not provide inconsistent information.

Clinton Police Detective Danielle Alexander testified that she responded to the children's hospital on July 19, 2009, that she took photographs of the victims' injuries, and that she assisted the physician during his examinations of the victims. She identified the photographs she took of A.F.'s injuries, noting bruises and welts on the lower thigh, red marks on the chest, a scratch on the upper thigh near the hip area, and red marks near the vagina. After the medical examination, Detective Alexander submitted the sexual assault kit to the Tennessee Bureau of Investigation (TBI) laboratory for analysis.

Detective Alexander testified that she interviewed the Defendant the following day at the police station and that the interview was audio recorded. The recording was played for the jury. In the recording, the Defendant stated that he entered the victims' room around 11:00 a.m. because he heard B.F. crying, although A.F. was still asleep. The Defendant said he placed a pacifier in B.F.'s mouth and laid B.F. down in the crib. The Defendant said he noticed A.F. was not wearing a pull-up diaper and was naked, woke A.F., and told A.F. to put on her pull-up diaper. The Defendant said he left the room and went to sleep. The Defendant said that the victims' mother called around 11:30 a.m., that he told her the victims' were still sleeping, and that after the telephone conversation ended, he entered the victims' room. He said "it went bad." The Defendant said A.F. was awake, behaving rowdy, and would not listen when he asked A.F. to lie down and to watch a movie. The Defendant said that as a result, he "whooped" A.F. with a belt and fly swatter and laid her on her bed. Relative to A.F.'s vaginal injuries, the Defendant told the detective that after he whooped A.F. and laid her on her bed, he inserted his index finger in A.F.'s vagina and described moving his finger. Detective Alexander testified that the Defendant moved his finger as though he were motioning for someone to move forward. In the recording, the Defendant stated that he did not know why he "did it" but said that it lasted for two seconds before he realized it was improper and left the room. The Defendant said A.F. did not say anything during the incident. When questioned about when A.F. said her "pee-pee" hurt, the Defendant said A.F. mentioned hurting after the victims' mother arrived home from work. He noted A.F. was scratching her vaginal area just before telling the victims' mother that A.F. was hurting. The Defendant also noted that his mother came to the home before the victims' mother arrived and asked if he was okay. He said it was after his mother arrived that he noticed A.F.'s face began to swell. The Defendant denied striking B.F. The Defendant inquired what would happen to him and said his biggest fear was going to jail.

Detective Alexander testified that after the interview, she drove to the victims' mother's home to take photographs and to collect A.F.'s bedding. Detective Alexander said that the bedding had been washed and was still wet inside the washing machine.

On cross-examination, Detective Alexander testified that the audio recording device was not activated before she and the Defendant entered the room and that she began recording after the Defendant agreed to speak with her. She did not recall the Defendant's saying initially that he did not want to speak to the police. She said that someone other than the Defendant told her that the Defendant inserted his finger in A.F.'s vagina because he was looking for a rash but that the Defendant never said anything about a rash.

Detective Alexander testified that she and the Defendant never discussed the marks on A.F.'s face and chest. She agreed that the marks on A.F.'s buttocks were consistent with being struck with a belt and fly swatter. She agreed her investigation showed A.F. and B.F. had received medical treatment at the emergency room related to a rash on A.F.'s face and B.F.'s chest.

Upon examination by the trial court, Detective Alexander testified that she considered the Defendant's "whooping" synonymous with spanking.

Dr. Dante Pappano, a pediatric emergency medicine and child abuse expert, testified that he treated the children at the children's hospital emergency room on July 19, 2009. He said that B.F. presented with multiple bruises on his "right flank," right buttock, hands, and face. Dr. Pappano noted that the bruise on B.F.'s buttock was loop-shaped and said that the bruise was consistent with non-accidental trauma. B.F. was also diagnosed with two ear infections and bronchiolitis. Dr. Pappano described the bruises as petechial, which were little purple spots appearing as tiny bruises.

Dr. Pappano testified relative to A.F. that she had bruises on her face, forehead, cheeks, lips, right inner thigh, and "dozens of red linear bruises over a global blue or purple bruise" and that she had a small scleral hemorrhage, which was an area of blood on the white of her eye. He said that the genital-urinary examination showed two small punctate hemorrhages, or petechia, and two one-millimeter tears along the posterior portion of the hymen. He said the tears were visible to the naked eye and magnification was not required. Although no active bleeding was noted during the examination, dried blood was noted on A.F.'s underwear.

Dr. Pappano testified that A.F. disclosed the Defendant "hit" her and that she shook her head affirmatively when asked if the Defendant hurt her "pee-pee." Dr. Pappano said that the victims' mother was inside the examination room when he initially questioned A.F. about her injuries, that the victims' mother attempted to lead A.F., and that Dr. Pappano twice asked the victims' mother to stop leading A.F. Dr. Pappano took A.F. to obtain a popsicle, and A.F. discussed the "physical abuse."

-10-

Dr. Pappano testified that he concluded the red linear bruises on A.F.'s buttocks were the result of non-accidental trauma. He said that the remaining bruises, when considered individually, were not indicative of abuse but were suggestive of non-accidental trauma when considered together. He also concluded that the vaginal tears were the result of non-accidental trauma. Relative to the punctate bruising, or petechia, he said that three tests were conducted to determine if A.F.'s platelet levels caused the tiny petechia. Two of the three tests were normal. Dr. Pappano said that although one test showed abnormal results, spontaneous bruising would not occur. He noted, though, that less force was necessary to cause the linear bruising.

On cross-examination, Dr. Pappano testified that the victims' mother reported that the redness in A.F.'s eye occurred four days previously. He agreed A.F. had older, yellow bruises on her back and said those bruises were probably consistent with accidental trauma that occurred twenty-four hours before he treated A.F. Dr. Pappano noted that dating bruises was not an exact science and depended upon many factors. Relative to the abnormal results from the blood test, Dr. Pappanno said that a normal result was between twenty-six and thirty-five and that A.F.'s result was forty-two, which created an increased risk for bruising and excessive bleeding as a result of severe trauma. On redirect examination, Dr. Pappano stated that he did not diagnose A.F. with a viral infection.

The victims' father testified that the children lived with their mother on the day of the incident and that within a year of the incident, the children began living with him. He said that after the children began living with him, A.F. was emotionally upset frequently and told him "things" that occurred while she lived with her mother. The victims' father decided to seek counseling for A.F., who saw a counselor for one and one-half years. He said that although A.F. was doing well at the time of the trial, it took time for her to forget. He said initially A.F. did not sleep well and had nightmares. Relative to B.F., the victims' father said B.F. was too young to remember anything that occurred on the day of the incident.

The victims' father testified that he took the children to Johns Hopkins for an evaluation relative to Dr. Pappano's concern that A.F. might have a blood disorder. The victims' father said that the results showed no disorder.

On cross-examination, the victims' father testified that DCS contacted him on July 20, 2009, regarding the juvenile court hearing. Although the victims' father could have taken custody of the children on the day of the hearing, he said he needed time to find suitable housing and insurance for the children. He said that he was single at the time and living at a hotel with a former co-worker, that the children's great-grandparents lived close, and that the great-grandparents agreed to care for the children until he could find a place to live.

On redirect examination, the victims' father testified that although he did not see the children often when they lived with their mother, he spoke to A.F. nightly on the telephone and that A.F. cried during many of their conversations. He noted A.F.'s crying after the children began living with him "was a scared cry."

The parties stipulated that the serology analysis of A.F.'s underwear and the vaginal swabs obtained during the physical examination failed to reveal the presence of semen.

Upon this evidence, the Defendant was convicted of aggravated rape of a child against A.F., aggravated child abuse against A.F., and child abuse against B.F. This appeal followed.

# I

## Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his aggravated rape of a child and aggravated child abuse convictions. The Defendant does not challenge his child abuse conviction. Relative to the aggravated rape of a child conviction, the Defendant argues that the State failed to prove beyond a reasonable doubt that he engaged in unlawful sexual penetration because no evidence established his conduct was based upon a sexual motivation. Relative to the aggravated child abuse conviction, he argues that the State failed to prove beyond a reasonable doubt that A.F. suffered serious bodily injury by causing severe bruising. The State responds that the evidence is sufficient. We agree with the State.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see also State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence." *State v. Dorantes*, 331

S.W.3d 370, 379 (Tenn. 2011). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *Id.* (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

## A.     Aggravated Rape of a Child

Aggravated rape of a child is defined as "the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is three (3) years of age or less." T.C.A. § 39-13-531(a). Sexual penetration is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body . . . into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required[.]" *Id*. § 39-13-501(7) (2010) (amended 2013).

The Defendant does not dispute that he penetrated A.F.'s vagina with his finger or that the victim was three years old. Rather, he argues that the State failed to prove that his conduct was based upon a sexual motivation. However, our supreme court has stated that "rape of child can be proven solely by evidence of sexual penetration, regardless of the motivation for the act." *State v. Barney*, 986 S.W.2d 545, 550 (Tenn. 1999). The record reflects that the Defendant admitted to Ms. Powell and to Detective Alexander that he penetrated A.F.'s vagina with his finger. The Defendant also demonstrated for Detective Alexander that he moved his finger as though he were motioning for someone to move forward. The expert medical testimony reflects that the hymen was torn twice from the Defendant's conduct. The State was not required to show that the Defendant had a sexual motivation for his conduct. The evidence is sufficient, and the Defendant is not entitled to relief on this basis.

## B.     Aggravated Child Abuse

In relevant part, "[a] person commits the offense of aggravated child abuse . . . who commits the offense of child abuse, as defined in § 39-15-401(a) . . . and . . . [t]he act of abuse . . . results in serious bodily injury to the child." T.C.A. § 39-15-402(a)(1). Generally, the offense is a Class B felony, but the offense is a Class A felony if the abused child is eight years of age or less. *Id*. § 39-15-402(b). A person commits a form of child abuse "who knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury." *Id.* § 39-15-401(a). A person acts "knowingly"

> with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist.

A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

*Id.* § 39-11-106(a)(20) (2010) (amended 2011, 2014); *see id.* § 39-11-302(b) (2014). "'Serious bodily injury to the child' includes, but is not limited to, second- or third-degree burns, a fracture of any bone, a concussion, subdural or subarachnoid bleeding, retinal hemorrhage, cerebral edema, brain contusion, injuries to the skin that involve severe bruising or the likelihood of permanent or protracted disfigurement, including those sustained by whipping children with objects." *Id.* § 39-15-402(d).

The Defendant's sole argument is that A.F.'s bruises did not constitute serious bodily injury. *See* T.C.A. § 39-15-402(d) (defining serious bodily injury to a child, in relevant part, as severe bruising). In the light most favorable to the State, the record reflects that although A.F. had older bruising on her back, A.F. had no injuries the night before the incident or the following morning when the victims' mother left for work. After the victims' mother returned home early from work at the Defendant's and Ms. Miller's requests, the victims' mother saw that A.F.'s face and lips were swollen, that she had little purple dots on her lips, and that she had bruises on her cheeks and mouth. After taking A.F. to the hospital, the victims' mother saw a light-colored bruise on the back of A.F.'s thigh, which extended to A.F.'s buttocks. The bruises gradually changed colors while at the hospital, and the victims' mother saw A.F.'s eye become bloodshot and red marks develop on A.F.'s face. Photographs taken at the hospital reflect that A.F. had purple-colored bruises around her mouth, lips, cheeks, forehead, buttocks, and thigh. The expert medical testimony reflects that A.F. had "dozens of red linear bruises over a global blue or purple bruise" on her buttocks, which were the result of non-accidental trauma. The photographs of A.F.'s buttocks are consistent with the expert medical testimony, and nothing in the record is inconsistent with the Defendant's admission to Ms. Powell and Detective Alexander that he spanked A.F. with a belt and fly swatter.

The determination of whether the Defendant's conduct inflicted serious bodily injury by causing severe bruising was a question of fact for the jury to determine. The evidence reflects that the injuries were inflicted after the victims' mother left for work but before A.F. arrived at the children's hospital. We have reviewed the photographs of A.F.'s bruises and conclude that the jury could have found beyond a reasonable doubt that A.F. suffered severe bruising resulting in serious bodily injury. The evidence is sufficient, and the Defendant is not entitled to relief on this basis.

# II

## Inadmissible Hearsay

The Defendant contends that the victims' mother's testimony relative to Ms. Miller's telling the victims' mother about the children's conditions in a telephone conversation was inadmissible hearsay. The Defendant also argues that the victims' mother's testimony relative to a hospital nurse's questioning A.F was inadmissible hearsay, which the trial court improperly admitted. The State responds that the evidence was not hearsay because it was not offered to prove the truth of the matter asserted. We agree with the State.

Hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay is inadmissible unless it qualifies as an exception. *Id.* at 802. However, testimony not offered for the truth of the matter asserted but offered for the effect on the listener is not subject to exclusion based on inadmissible hearsay. *State v. Venable*, 606 S.W.2d 298, 301 (Tenn. Crim. App. 1980); *see State v. Carlos Jones*, No. W2008-02584-CCA-R3-CD, 2010 WL 3823028, at *14-15 (Tenn. Crim. App. Sept. 30, 2010), *perm. app. denied* (Tenn. Mar. 9, 2011).

### A. Testimony Relative to Ms. Miller

The record reflects that the prosecutor questioned the victims' mother relative to the telephone conversations she had with the Defendant while she was at work. The victims' mother testified that she spoke to the Defendant, who said A.F. was not feeling well. Concerned that a previous viral infection was lingering, the victims' mother called Ms. Miller, the Defendant's mother, and requested Ms. Miller administer the victims' medications. The victims' mother received a subsequent text message from the Defendant requesting she come home, and she called the Defendant to find out what was happening. The victims' mother testified that she spoke to Ms. Miller during the call. Ms. Miller reported that A.F. had puffy lips and face, that A.F. looked sick, and that the victims' mother should return home and take the victims to the hospital. The victims' mother left work to take the children to the hospital.

The Defendant objected on the ground of hearsay to the testimony relative to Ms. Miller's statements to the victims' mother regarding A.F.'s appearance and the request to return home and take the children to the hospital. The prosecutor responded that the testimony was offered for the effect on the listener and explained why the victims' mother left work and returned home. The trial court overruled the objection. We conclude that the

trial court did not err by admitting the evidence because it was not offered for the truth of the matter asserted and was not hearsay. The Defendant is not entitled to relief on this basis.

We note that the Defendant argues that the trial court should have provided a limiting instruction as to the proper use of the testimony. He concedes he did not request a limiting instruction but argues that plain error relief requires a reversal of his convictions. *See* T.R.A.P. 36. We disagree. The relevant testimony focused upon the reasons that the victims' mother returned home from work and sought medical treatment for the victims. We cannot conclude that the Defendant was prejudiced by the absence of a limiting instruction. The record reflects that the Defendant admitted to multiple individuals to striking A.F. with a belt and a fly swatter and to penetrating A.F.'s vagina with his finger. Likewise, sufficient evidence was presented relative to A.F.'s and B.F.'s injures. He is not entitled to relief on this basis.

### B.    Testimony Relative to Children's Hospital Nurse

The record reflects that during the victims' mother's testimony regarding the events at the children's hospital, she stated that a nurse asked how A.F. sustained the bruises. The victims' mother testified that the bruises were not visible when the victims' mother left for work that morning and that the victims' mother did not notice the bruises when they left home to drive to the hospital. The victims' mother also told the nurse that she had been at work and that the Defendant had cared for the victims. The Defendant argued the nurse's question and the victims' mother's response were inadmissible hearsay. The prosecutor responded that the testimony was not offered for the truth of the matter asserted but was offered to show the victims' mother's response to the nurse's question. The trial court ruled that the victims' mother could respond to the questions asked of her and that the testimony was not for the truth of the matter asserted.

We conclude that the trial court did not err by admitting the testimony. The victim's mother's testimony regarding her answers to the nurse's question was not offered for the truth of the matter asserted and was not inadmissible hearsay. However, the victims' mother's statement that she told the nurse that she was at work when the incident occurred and that the Defendant cared for the children was offered for the truth of the matter asserted. In any event, the victims' mother testified previously that the Defendant was home alone with the children while she was at work earlier that day, and we note that the victims' mother was subject to cross-examination. Any error in this regard was harmless, and we note the overwhelming evidence of the Defendant's guilt.

The Defendant again argues that the trial court should have provided a limiting instruction as to the proper use of the testimony.  He concedes he did not request a limiting instruction but argues plain error relief requires a reversal of his convictions.  *See* T.R.A.P. 36.  We disagree and conclude that the Defendant was not prejudiced by the absence of a limiting instruction.  The record reflects that the Defendant admitted to multiple individuals he struck A.F. with a belt and a fly swatter and that he penetrated A.F.'s vagina with his finger.  He is not entitled to relief on this basis.

## III

### Improper Comment on the Evidence

The Defendant contends that the trial court improperly commented on the evidence by describing three photographs received as exhibits.  He argues that the court's description of the photographs expressed validation of the photographs.  The State responds that the Defendant failed to object to the trial court's statements when the photographs were received as exhibits and alternatively, argues that the Defendant is not entitled to plain error relief.

The first relevant photograph was admitted during the victims' mother's testimony and depicts a dried red substance on the vaginal area of A.F.'s underwear.  The victims' mother testified that the photograph depicted A.F.'s panties and that she saw blood on the panties.  The Defendant objected to the witness's characterization that the red substance was blood, and the court sustained the objection.  The victims' mother testified that she believed the red substance was blood because it was the same color as blood and went "directly through her panties" and "soaked through."  The victims' mother said the substance could not have been mistaken for feces from a bowel movement.  The Defendant did not object to the admission of the photograph, and the trial court noted the lack of objection and said the exhibit was "panties showing what appears to be blood."  The Defendant did not object to the court's statement.

The second photograph was admitted during Detective Alexander's testimony and depicts red marks on A.F.'s thigh.  During Detective Alexander's testimony, she stated that the marks were welts in the shape of a line.  The Defendant did not object to the admission of the photograph, and the trial court noted the lack of objection and said the exhibit was a photograph of the "thigh of [A.F.] showing welts."  The Defendant did not object to the court's statement.

The third photograph was admitted during Detective Alexander's testimony and depicts red marks on A.F.'s thigh near her hip and vagina.  During her testimony, Detective Alexander stated that the marks appeared to be scratches.  The Defendant objected to the

detective's characterization of "red marks beside the vagina." At a bench conference, the trial court stated that the detective testified that "they appeared to be scratches" and overruled the objection. The Defendant did not object to the admission of the photograph, and the trial court noted the lack of objection and said the exhibit was a photograph of "the right thigh with that appears to be scratches." The Defendant did not object to the court's statement.

Because the Defendant did not object to the trial court's statements identifying each photograph, consideration of the merits of the issue is waived. *See* T.R.A.P. 36(a). Our review is limited to consideration of whether plain error exists. *See* T.R.A.P. 36(b).

> Five factors are relevant
>
> when deciding whether an error constitutes "plain error" in the absence of an objection at trial: "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). All five factors must exist in order for plain error to be recognized. *Id.* at 283. "[C]omplete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Id.* In order for this court to reverse the judgment of a trial court, the error must be "of such a great magnitude that it probably changed the outcome of the trial." *Id.*; *Adkisson*, 899 S.W.2d at 642.

"In all cases the trial judge must be very careful not to give the jury any impression as to his feelings or to make any statement which might reflect upon the weight or credibility of evidence or which might sway the jury." *State v. Suttles*, 767 S.W.2d 403, 406-07 (Tenn. 1989). A judge "should always be extremely careful not to express or intimate any opinion on any fact to be passed upon by the jury." *Graham v. McReynolds*, 18 S.W. 272, 275 (Tenn. 1891). The record reflects, though, that the trial court made no improper statements regarding the exhibits. The court's statements, rather, were based upon the respective witnesses' testimony in order to identify the exhibits for the record. We likewise note the overwhelming evidence of the Defendant's guilt. The Defendant is not entitled to relief on this basis.

# IV

## Improper Opinion Testimony

The Defendant contends that the trial court admitted improper opinion testimony by allowing Ms. Powell to testify about the ages of the victims' bruises. He argues that Ms. Powell was not qualified to render an opinion because she was not a medical expert. The State responds that the trial court did not abuse its discretion because Ms. Powell's statements were based upon common knowledge and were not conclusory.

Tennessee Rule of Evidence 701 states, "If a witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are rationally based on the perception of the witness and helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." Tenn. R. Evid. 701 (a)(1)-(2). Our supreme court has noted that "[i]n situations where a [lay] witness 'cannot readily and with equal accuracy and adequacy' testify without an opinion, the witness may state opinions requiring no expertise," including whether a person was intoxicated or whether a car was travelling fast. *State v. Sparks*, 891 S.W.2d 607, 614 (Tenn. 1995) (quoting Tenn. R. Evid. 701, Advisory Comm'n Cmt.).

In contrast, Tennessee Rule of Evidence 702, regarding expert opinion testimony, states, "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Lay opinion testimony, however, is "limited to those observations of a lay witness that are not based on scientific, technical, or other specialized knowledge which would qualify the witness as an expert under Rule 702." *State v. Timothy Murrell*, No. W2001-02279-CCA-R3-CD, 2003 WL 21644591, at *6 (Tenn. Crim. App. July 2, 2003) (citing *United States v. Conn*, 297 F.3d 548, 553 (7th Cir. 2002). Opinion testimony otherwise admissible is not objectionable on the basis that the opinion embraces an ultimate issue to be decided by the tier of fact. Tenn. R. Evid. 704.

The Defendant argues in his brief that Ms. Powell was permitted to provide improper opinion testimony relative to both victims' injuries, but he has cited only to one page of the trial transcript that addresses B.F.'s bruises. Our review is limited to those statements.

Ms. Powell testified relative to B.F.'s injuries that she observed "red dots, petechia or something all over his face" and "a [red] whelp-like shape on his side," which was "a perfect outline of something." She said the whelp was not "in the stage of bruising," was "very fresh," and was red. The Defendant objected on the ground that Ms. Powell had provided an

improper opinion relative to the age of the bruise. The trial court overruled the objection and stated the witness could provide her opinion of what she observed and thought. The court noted that Ms. Powell's work focused on child physical and sexual abuse and that she said the injury appeared to be fresh. The court said that "[w]e all have injuries we can all tell what a bruise [is] . . . whether it looks new or fresh."

Our supreme court has stated that lay opinion testimony is admissible when "'facts [are] perceived by [the] senses . . . , and it is difficult to describe them adequately to the jury, and the conclusion or inference to be drawn from such facts is simple and within the range of common experience[.]'" *Blackburn v. Murphy*, 737 S.W.2d 529, 532 (Tenn. 1987) (quoting *Reed v. Allen*, 522 S.W.2d 339, 343 (Tenn. App. 1974)). In *State v. Samuel*, 243 S.W.3d 592, 603 (Tenn. Crim. App. 2007), this court concluded that a female police officer's testimony that a mark on the victim's neck appeared recent was proper lay opinion testimony because it was "within the common knowledge of the general public, especially a mother." The court noted that the factual foundation to support the officer's opinion included the officer's being a mother and having seen several injuries on her own children. *Id*. The court determined that the opinion was based on the witness's personal observations, required no expertise, and was within the range of common experience and that the officer's testimony was "important to establishing" whether the victim suffered serious bodily injury during the alleged rape. *Id*.

In the present case, Ms. Powell testified that she had investigated allegations of child physical and sexual abuse for approximately five years. She observed B.F.'s whelp marks, which were red-colored. The photograph evidence supports Ms. Powell's testimony and do not reflect a blue or purple color. We conclude that the freshness of the whelp was within the common knowledge of the general public, was based on Ms. Powell's personal observations, required no expertise, and was within the range of common experience. We, likewise, conclude that the testimony was probative of when the injuries were inflicted. *See* Tenn. R. Evid. 701. We note that although the Defendant argues that Ms. Powell's testifying that the whelps appeared fresh contradicted Dr. Pappano's expert testimony on cross-examination that dating bruises was not an exact science when questioned about A.F.'s bruises, Dr. Pappano was not questioned about the age of B.F.'s injuries. Nothing in the record reflects that Dr. Pappano documented the color of B.F.'s injuries. Therefore, we conclude that the trial court did not abuse its discretion by permitting Ms. Powell to testify about the freshness of B.F.'s whelp marks. The Defendant is not entitled to relief on this issue.

**V**

**Jury Instructions**

The Defendant contends that the trial court erred relative to the aggravated rape of a child conviction by failing to instruct the jury on the difference between lawful and unlawful genital penetration. In a related issue, the Defendant also contends relative to the aggravated child abuse conviction that the trial court erred by refusing to answer a jury question during its deliberations regarding the definition of severe bruising when the final jury instructions did not include a definition. He claims the court should have provided the jury with an additional definition. The State responds that the Defendant has waived these issues because he failed to request special jury instructions and alternatively, argues that the trial court properly instructed the jury and allowed the jury to determine whether the evidence satisfied the ordinary definition of severe bruising.

A criminal defendant has "a right to a correct and complete charge of the law." *Hanson*, 279 S.W.3d at 280 (citing *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000)). As a result, a trial court has a duty "to give proper jury instructions as to the law governing the issues raised by the nature of the proceeding and the evidence introduced at trial." *State v. Hawkins*, 406 S.W.3d 121, 129 (Tenn. 2013) (citing *Dorantes*, 331 S.W.3d at 390); *see State v. Thompson*, 519 S.W.2d 789, 792 (Tenn. 1975). An erroneous jury instruction, though, may deprive the defendant of the constitutional right to a jury trial. *See Garrison*, 40 S.W.3d at 433-34.

Tennessee Rule of Criminal Procedure 30(b) states that after a trial court instructs the jury, "the parties shall be given an opportunity to object . . . to the content of an instruction that was given or the failure to give a requested instruction." Although the failure to object does not does not prevent a party from assigning error relative to instructional error in a motion for new trial, our supreme court has stated that "alleged omissions in the jury charge must be called to the trial judge's attention or be regarded as waived." *State v. Robinson*, 146 S.W.3d 469, 509 (Tenn. 2004); *see State v. Haynes*, 720 S.W.2d 76, 84-85 (Tenn. Crim. App. 1986); *see also* Tenn. R. Crim. P. 30(b). As a result, "[i]n contrast to an erroneous instruction or the failure to give a requested instruction, defense counsel cannot sit on an objection to an omitted charge and allege it as a ground in the motion for a new trial." *Robinson*, 146 S.W.3d at 509.

**A.      Aggravated Rape of Child**

The record reflects that the trial court took a recess after the presentation of the proof. When court reconvened, the trial judge noted that the jury instructions were prepared during

-21-

the break and that the instructions were a "combined effort" of the parties. The judge noted that the final corrections were made fifteen minutes before court reconvened. The judge asked the parties if they had any other additions, changes, or corrections to the jury instructions or to the verdict forms. Trial counsel replied, "No, Your Honor." When the judge asked if counsel was satisfied with the instructions and wanted the judge to provide the jury with the instructions, counsel said, "Yes, Your Honor." No objections were made, and closing arguments were made before the court provided the jury with the final instructions.

Relative to the aggravated rape of a child charge, the trial court instructed the jury regarding the elements of the offense, including sexual penetration. The court instructed the jury that sexual penetration "means any other intrusion, however slight, of any part of a person's body or any object in the genital or anal openings of the alleged victim[']s, the defendant[']s or any other person's body[, but] emission of semen is not required." The court, likewise, instructed the jury on lesser included offenses. After reading the instructions in its entirety to the jury, the court asked the prosecutor and trial counsel if they had "any other additions, corrections or alterations to the jury instructions." Counsel replied, "No, Your Honor." The prosecutor noted three typographical errors, which were corrected by the court. Counsel made no objections or special requests.

We conclude that the Defendant has waived consideration of the issue by failing to argue in the trial court that an additional instruction was warranted regarding unlawful sexual penetration. *See Robinson*, 146 S.W.3d at 509; *Haynes*, 720 S.W.2d at 84-85; *see also* T.R.A.P. 36(a). Furthermore, we conclude plain error does not exist. *See Smith*, 24 S.W.3d at 282; *Adkisson*, 899 S.W.2d at 641-42. The record reflects that the court provided the proper instructions. *See* T.P.I.—Crim. 10.12 (18th ed. 2014). The Defendant has not established a violation of a clear and unequivocal rule of law or that a substantial right was adversely affected. The Defendant is not entitled to relief upon this basis.

### B.    Aggravated Child Abuse

The record reflects that during jury deliberations, a question was submitted to the trial court. The court stated that the jury wanted the court to "clarify the definition of the term severe bruising required for the charge of aggravated child abuse." The prosecutor asked, "Severe bodily injury, is that what they are saying?" Trial counsel showed the court Tennessee Code Annotated section 39-15-402(d), defining serious bodily injury to the child, in relevant part, as "injuries to the skin that involve severe bruising or the likelihood of permanent or protracted disfigurement, including those sustained by whipping children with objects." The record reflects that the definition of serious bodily injury was reviewed by the court and the parties. The court stated, "Counsel, it appears that they are going to have to make their own determination as to what they believe severe bruising is. It says what it says.

Let's bring them in." Trial counsel did not object to the court's determination and did not offer any suggestions about how to clarify the matter for the jury. After the jury returned to the courtroom, the court instructed the jury as follows:

> [S]evere bruising . . . the only definitions that we have and that I'm able to give you is what is in here. Whether or not you determine what . . . severe is what you observe as to whether or not you think it's severe. It's a matter of what each person determines is the best that I can tell you on that. I don't have a definition, that I'm aware of, that I can give . . . to you so it's a matter of finding of facts, whether or not you think it's severe bruising. I know that doesn't go into great clarification for you and apologize for that but I don't have anything further available to me that would show in this instant what you determine as a finding of fact what severe bruising is. . . . That's a finding of fact you are going to have to make based upon the definition that they have here. And you have got to determine what you believe severe bruising is based upon the proof that's been submitted to you.

The jury resumed its deliberations, and no additional questions were submitted.

We conclude that the Defendant has waived consideration of the issue by failing to object to the trial court's deciding to allow the jurors to determine whether A.F.'s injuries constituted serious bodily injury by severe bruising. *See* T.R.A.P. 36(a). We, likewise, conclude that no plain error exists. *See Smith*, 24 S.W.3d at 282; *Adkisson*, 899 S.W.2d at 641-42. This court has stated that "where words and terms are in common use and are such as can be understood by persons of ordinary intelligence, it is not necessary, in the absence of anything in the charge to obscure their meaning, for the court to define or explain them." *State v. Summers*, 692 S.W.2d 439. 445 (Tenn. Crim. App. 1985). The words severe and bruising are terms in common use and are understood by persons of ordinary intelligence. The determination of whether A.F.'s injuries resulted in severe bruising was a question of fact for the jury. The court gave a proper instruction, and the Defendant has not shown the court's lack of further clarification violated a clear and unequivocal rule of law or that a substantial right was adversely affected. *See* T.P.I.—Crim. 21.01(c) (18th ed. 2014). The Defendant is not entitled to relief on this basis.

## VI

## Excessive Sentence

The Defendant contends that his sentence for the aggravated rape conviction is excessive. He does not challenge his aggravated child abuse and child abuse sentences. He

argues that the trial court improperly applied enhancement factor (4), relative to a victim's particular vulnerability, erred by finding that the Defendant was a poor candidate for rehabilitation, and improperly relied upon depreciating the seriousness of the offense and deterrence. The State responds that the trial court did not abuse its discretion because the Defendant received a within-range sentence supported by the record. We agree with the State.

This court reviews challenges to the length and manner of service of a sentence within the appropriate sentence range "under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). A trial court must consider any evidence received at the trial and sentencing hearing, the presentence report, the principles of sentencing, counsel's arguments as to sentencing alternatives, the nature and characteristics of the criminal conduct, any mitigating or statutory enhancement factors, statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, any statement that the defendant made on his own behalf, and the potential for rehabilitation or treatment. *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991) (citing T.C.A. §§ 40-35-103 (2014), -210 (2014); *State v. Moss*, 727 S.W.2d 229, 236 (Tenn. 1986); *State v. Taylor*, 744 S.W.2d 919 (Tenn. Crim. App. 1987)); *see* T.C.A. § 40-35-102 (2014).

Likewise, a trial court's application of enhancement and mitigating factors is reviewed for an abuse of discretion with "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Bise*, 380 S.W.3d at 706-07. "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id.* at 706. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed . . . within the appropriate range" will be upheld on appeal. *Id.*

At the sentencing hearing, the presentence report was received as an exhibit. The report reflects that the Defendant had no previous criminal convictions. However, at the time of the presentence investigation, an outstanding warrant existed for the Defendant's arrest from Boone County, Kentucky. The report states that the Defendant was charged with receiving stolen property valued at less than $10,000, that the offense occurred while the Defendant was released on bond for the present offenses, and that the Defendant failed to appear in the Boone County court.

The presentence report reflects that the Defendant completed vocational certification programs while attending high school and received a special education diploma. Anderson County School System records indicated that the Defendant was "in the borderline range of

intellectual ability" on January 29, 2002. Although the Defendant was found competent to stand trial, he reported that his disability was related to comprehension and that he had difficulty understanding people when they used unfamiliar words, spoke fast, or spoke loud. The Defendant reported that he did not understand Ms. Powell and was confused and that "they were yelling at me."

The Defendant reported depression, which began at the time of his arrest in the present case. He stated that he previously attempted suicide by hanging when he was age fourteen but that his sister found him. He admitted he had contemplated suicide since his incarceration. The Defendant reported that he was estranged from his father and said he harbored feelings of rejection, loss, grief, and being unwanted and unimportant. The Defendant reported a fair relationship with his mother and recalled spending time in his bedroom to escape arguments with his stepfather. The Defendant reported a good relationship with his paternal grandfather and stepgrandmother and said if he were separated from his grandfather and stepgrandmother, he intended to commit suicide.

The psychosexual evaluation report reflects that although the Defendant admitted during his police interview to striking A.F. with a belt and a fly swatter and penetrating her vagina with his finger, he denied any wrongful conduct during the psychosexual evaluation. The evaluator found that the Defendant had no remorse for his conduct and that the Defendant communicated in an evasive manner during the evaluation. Although the evaluator was unable to determine whether the Defendant was a "true pedophile" or an opportunist, the evaluator concluded that the Defendant needed the most restrictive supervision to prevent recidivism.

The Defendant provided a statement during the presentence investigation in which he denied any wrongdoing and said his admission to the police was "invalid because he did not understand the legal process" and because his statements were "twisted" and "turned on him." The Defendant denied hurting the children and knowing the extent of their injuries until he spoke to the victims' mother at the hospital. He said that Ms. Powell yelled at him and forced him to say he hurt the children. The Defendant said he told Ms. Powell "something so she would stop yelling." He said that the victims' mother was dating other men, that he thought one of the men might have been responsible for the victims' injuries, and that the victims' mother was lying to protect the man responsible. The Defendant also thought the victims' mother might have been responsible for the victims' injuries. He recalled the victims' mother leaving the children alone in the bathtub and leaving the children home alone on previous occasions.

The victims' father provided a victim impact statement. In the statement, he said that B.F. was too young to recall the events but that A.F. remembered the abuse. The victims' father said A.F. was scared to be alone, had nightmares, and developed a fear of hospitals, physicians, and men. He said that two weeks after the children came to live with him in Maryland, A.F. still had bruises on her back. He said that although A.F. was no longer bleeding, she complained about pain in her vaginal area. The victims' father said that B.F.'s bruises had mostly healed. The victims' father said the children did not appear to have any lasting physical conditions. He noted, though, that A.F. underwent counseling for more than one year and was doing well at the time of the sentencing hearing. The victims' father requested the maximum sentence.

Probation and Parole Officer Lynnia Pinkham prepared the Defendant's presentence report and provided testimony consistent with the report. She said that the Defendant discussed his admissions to Ms. Powell and Detective Alexander, that the Defendant said he felt threatened and compelled to "make those statements," that he did not understand the accusations, and that he signed "things" without knowing what he was doing. Ms. Pinkham said that the psychosexual evaluator concluded that although the Defendant had difficulty with reading comprehension, he understood the questions asked of him. She said that the Defendant did not appear confused when she interviewed him. She said that he answered her questions, asked questions, and understood her responses to his questions.

On cross-examination, Ms. Pinkham testified that the Defendant was cooperative with her investigation. She said the Defendant stated he loved the children, although he did not feel comfortable caring for them alone. She agreed the Defendant believed the victims' mother "trapped" him into caring for the children on the day of the incident. Ms. Pinkham agreed the Defendant's mother did not provide Ms. Pinkham with a statement. Ms. Pinkham agreed the psychosexual evaluator could not determine whether the Defendant was an opportunist or a pedophile because of the Defendant's evasiveness and deception during the evaluation.

The Defendant testified that he was innocent and did not hurt the victims. He said that he saw the children two or three times per day for more than one year and that he had a good relationship with them. He said he treated the children as though they were his children. He said that he was nineteen and had recently graduated from high school when he and the victims' mother began a romantic relationship and that the victims' mother asked him to care for the children multiple times when she needed childcare. He said he was uncomfortable caring for the children alone because he did not have children and had no parenting skills.

The Defendant testified that he moved to Kentucky to live with his grandfather when his relationship with the victims' mother ended, that he received a request to return to Tennessee to retake a "Gateway" test at his high school, that school officials said he failed the test, and that he returned to retake the test. He said that the day before the incident, the victim's mother called him requesting he come to her home. He said that the victims' mother wanted to reconcile, that he went to the home, and that the victims' mother asked him to care for the children the next day while she worked. He said that he told the victims' mother that he would not watch the children, that he fell asleep, and that when he awoke, the victims' mother had gone to work. He said the children were still asleep.

The Defendant acknowledged that the trial court denied his motion to suppress the statement he provided to Detective Alexander and said that he gave a statement because he was scared and did not know what was happening. He said, though, he was cooperative and truthful during his interview. Relative to the psychosexual evaluation, he said he was truthful and answered all the questions during the evaluation.

The Defendant testified that he was "disheartened" by what the victims experienced and said he understood the victims' father's feelings about what the children suffered. The Defendant, though, maintained his innocence and said he rejected a plea offer for a shorter sentence because he was innocent.

On cross-examination, the Defendant testified that he had the opportunity to tell the trial judge at the suppression hearing that his police statement was coerced and that he did not understand what was happening. He agreed nobody told him what to tell Detective Alexander. Relative to his demonstrating during his police interview how he penetrated A.F.'s vagina with his finger, he asserted his right against self-incrimination when asked if anyone told him how to demonstrate his conduct.

The Defendant testified that he moved to Kentucky in May 2009 and that he did not see the victims again until the incident. He said that he had lived with the victims and their mother before he graduated from high school and moved to Kentucky after graduation. He agreed this portion of the timeline was not included in his written or audio recorded statements. The Defendant did not recall telling the presentence investigator that he met Detective Alexander at the hospital but said he first met the detective at the police station. He did not recall the detective's reviewing the waiver of rights form with him.

Alicia Pence, the Defendant's older sister, testified that before she graduated from high school in 2004, she and the Defendant lived together with their remaining siblings. She said that she and the Defendant were close and that she was a mother figure to the Defendant. She said that the Defendant occasionally babysat their younger sister and that she never

observed anything inappropriate. She said that the Defendant had a learning disability, took special education classes in high school, and needed repetitive explanations for simple tasks.

Chelsea Miller, the Defendant's younger sister, testified that before the Defendant was incarcerated, he lived with her, their mother, and Ms. Miller's father. Ms. Miller said the Defendant was her best friend, and they had a good relationship. She said that the Defendant had babysat and had been around young children frequently and that she had never seen the Defendant behave inappropriately with anyone.

Tammy Moore testified that she had known the Defendant since he was age seven and that the Defendant had been a student on the school bus she drove. She said the Defendant rode her school bus in middle and high schools. She recalled that the Defendant was one of the best students on her bus and that he assisted her periodically. She said that the Defendant never caused disruptions and that the Defendant always helped prevent problems between students. She said the students on her bus ranged from kindergarteners to high school seniors. She said the Defendant interacted with all the students on the bus and was a role model for some students. She said that she never saw the Defendant behave inappropriately with another student and that she would have disciplined the Defendant had she seen inappropriate conduct.

Patricia Gifford, the Defendant's aunt, testified that she lived next door to the Defendant's mother's home and that her children grew up with the Defendant and his siblings. She said the Defendant was an obedient, cooperative, polite, and helpful child. She never saw the Defendant act inappropriately with anyone. On cross-examination, Ms. Gifford testified that although she knew the Defendant had difficulty in school, she was unaware of the Defendant's depression.

Sharon Vanhuss testified that the Defendant and her son had been good friends for five or six years, that they were neighbors, and that they had attended the same schools. She said the Defendant visited her home multiple times per week. She noted that her younger daughter was in the home when the Defendant visited. She said that she never had concerns about the Defendant's being around her daughter and never saw anything inappropriate. She believed the Defendant was innocent.

The trial court imposed an effective sixty-year sentence. Relative to the aggravated rape of a child conviction, the court sentenced the Defendant as a Range III offender pursuant to statute and imposed a sixty-year sentence. *See* T.C.A. § 39-13-531(b). The court sentenced the Defendant as Range I offender to twenty-five years for aggravated child abuse and to two years for child abuse. In determining the sentences, the court noted its consideration of the principles and purposes of sentencing, the presentence report, the

evidence presented at the suppression hearing, the trial, and the sentencing hearing, and the statistical information relative to the offenses.

The trial court noted its previous findings from the suppression hearing that the Defendant spoke to the police voluntarily and was not forced or coerced to provide a statement. The court discredited the Defendant's sentencing hearing testimony in its entirety and noted the Defendant's invoking his Fifth Amendment right against self-incrimination when questioned about his penetrating A.F.'s vagina. The court noted that the Defendant's denying any wrongdoing during his sentencing testimony and the presentence investigation was inconsistent with his police statement in which he admitted to striking A.F. with a belt and a fly swatter and to inserting his finger in A.F.'s vagina. The court also noted the Defendant's blaming the victims' injuries on others during the presentence investigation and found that the Defendant took no responsibility for his conduct and had no remorse.

The trial court stated it was concerned about the psychosexual evaluator's conclusion that the Defendant "communicated in an evasive manner" and "took great pains to be deceptive and unclear about himself as a psychosexual person." The court noted that the Defendant's psychiatric symptomology denoted some paranoia but found that his intelligence was intact, although possibly slightly below average. The court credited the evaluator's conclusions and found that the Defendant needed the most restrictive supervision possible to prevent future similar criminal conduct.

Relative to the victims, the trial court found that B.F. did not recall the incident but that A.F. remembered the abuse, was scared to go anywhere after the father obtained custody, had nightmares and woke up screaming, and was scared of men, physicians, and hospitals. The court found that A.F. had eight black and blue welts on the side of her body when she went to live with her father. The court found that the injury to the vagina caused the bleeding.

Relative to mitigating factors, the trial court found that none applied. The court refused to apply factor (6) because the Defendant's age "had nothing to do with it." *See id*. § 40-35-113(6) ("The defendant, because of youth . . . , lacked substantial judgment in committing the offense[.]"). The court noted that although the defense witnesses were credible, sexual offenses were not usually committed in public or in the presence of other people well known to a defendant. The court found that the witnesses could not help the Defendant simply because they never saw the Defendant behave inappropriately.

Relative to enhancement factors, the court found that factor (4) applied to each conviction because the victims were ages one and three. The court noted B.F. was not old enough to talk and that both victims were still wearing diapers. *See* T.C.A. § 40-35-114(4)

("A victim of the offense was particularly vulnerable because of age[.]").  The court found that factor (5) applied to the aggravated rape of a child and aggravated child abuse convictions and noted its previous discussion about A.F.'s injuries.  *See id.* § 40-35-114(5) ("The defendant treated . . . a victim . . . with exceptional cruelty during the commission of the offense[.]").  Although the court initially applied factor (6) to the aggravated rape of a child and aggravated child abuse convictions because of the injuries sustained, the prosecutor reminded the court that factor (6) could not apply to the aggravated child abuse conviction because of the elements of the offense.  The court agreed and applied factor (6) only to the aggravated rape of a child conviction based on A.F.'s injuries.  *See id.* § 40-35-114(6) ("The personal injuries inflicted upon . . . the victim was particularly great.").  The court found that factor (14) applied to each conviction because the Defendant's position of trust as a babysitter significantly facilitated the commission of the offenses.  *See id.* § 40-35-114(14) ("The defendant abused a position of . . . private trust . . . in a manner that significantly facilitated the commission or the fulfillment of the offense.").  The court noted that the Defendant, if he were to be believed, considered the victims as his own children.  The court found that although "reason and common sense" show that the Defendant committed the aggravated rape of a child for sexual gratification, no proof was presented.  *See id.* § 40-35-114(7) ("The offense involved a victim and was committed to gratify the defendant's desire for pleasure or excitement[.]").

The trial court found that confinement was necessary to avoid depreciating the seriousness of the offenses and to serve as a deterrent to others likely to commit similar offenses.  The court found that the Defendant could not be rehabilitated.  The court noted that the Defendant denied any wrongdoing, had lied, and was deceptive during the psychosexual evaluation.  The court found that the Defendant refused to take responsibility for his conduct.  Although the court found that the Defendant did not have a previous criminal history, it also found that the lack of previous criminal conduct did not "help him much."

The Defendant argues that the trial court erred by applying enhancement factor (4) regarding the vulnerability of the age of the victim.  The Defendant argues the victim's age was an element of the aggravated rape of a child conviction and that application of factor (4) was improper.  Our supreme court has concluded that "although age is an element of . . . aggravated rape involving a child . . . , factor (4) may be used 'if circumstances show that the victim, because of [the victim's] age or physical or mental condition, was in fact, particularly vulnerable.'"  *State v. Kissinger*, 922 S.W.2d 482, 487 (Tenn. 1996) (quoting *State v. Adams*, 864 S.W.2d 31, 35 (Tenn. 1993)).  The court explained that factor (4) may be used to enhance a sentence "when a victim's natural physical and mental limitations renders the victim particularly vulnerable for his or her age because of an inability to resist, a difficulty in calling for help, or a difficulty in testifying against the perpetrator."  *Kissinger*, 922 S.W.2d at 487.

The record reflects that A.F. was age three at the time of the offenses. At the trial, A.F. identified her buttocks and vaginal area on an anatomical drawing and said the areas were for bad touches. She did not want to discuss bad touches because she was scared and refused to answer any further questions. As a result, she had difficulty in testifying against the Defendant. Although the Defendant does not challenge his child abuse sentence, we note B.F. was unable to testify because he was unable to communicate what occurred during the offenses as a result of his age. B.F. was approximately eighteen months old and confined to a crib at the time of the incident. A.F. and B.F. were the only individuals present when the Defendant committed the offenses, which created an inability to resist the Defendant. A.F. was also physically limited in resisting the Defendant, calling for help, and ending the abuse because of her size. The victims were small children and any attempts to resist an adult male were futile. We conclude that the trial court did not err by applying enhancement factor (4).

The Defendant also argues no evidence supports the trial court's finding that he could not be rehabilitated. We disagree. The record reflects that the Defendant admitted to Ms. Powell and Detective Alexander that he struck A.F. with a fly swatter and a belt and that he penetrated her vagina with his finger. However, the Defendant denied any wrongdoing at the time of the sentencing hearing. After having heard the proof at the trial, the trial court discredited the Defendant's sentencing hearing testimony and noted that the Defendant asserted his Fifth Amendment right against self-incrimination when questioned about his penetrating A.F.'s vagina. The psychosexual evaluation reflects that the Defendant "communicated in an evasive manner" and "took great pains to be deceptive and unclear about himself as a psychosexual person." The evaluator concluded that the Defendant had no remorse for his conduct. Although the evaluator was unable to determine if the Defendant was a "true pedophile," the evaluator concluded that the Defendant needed the most restrictive supervision to prevent recidivism. Furthermore, after the trial, the Defendant blamed the victims' mother and an unknown man for the victims' injuries. The record supports the trial court's finding that the Defendant took no responsibility for his actions and that he had no remorse for his conduct. The court's finding that the Defendant could not be rehabilitated was based on the Defendant's failure to take responsibility for his conduct, his deceit during the psychosexual evaluation, and his lack of candor during his sentencing hearing testimony. The court did not err by finding that the Defendant was incapable of rehabilitation.

Finally, the Defendant argues that the trial court erred by relying on depreciating the seriousness of the offense and deterrence in imposing the maximum sentence for the aggravated rape of a child conviction. The record reflects that the court considered statistical information available for the offenses. The court relied heavily in its sentencing determinations on the nature of the offenses, the Defendant's breach of private trust, the Defendant's lack of candor during the presentence investigation and at the sentencing

hearing, and the psychosexual evaluator's conclusions and recommendations. The Defendant received a within-range sentence for a Class A felony, and the record reflects that the trial court complied with the purposes and principles of sentencing. The court properly applied four enhancement factors to the aggravated rape of a child conviction. We note that A.F. suffered two hemorrhages and two tears along the posterior portion of the hymen, which were visible to the naked eye. The trial court did not abuse its discretion by imposing a sixty-year sentence. The Defendant is not entitled to relief on this basis.

## VII

### Cumulative Error

The Defendant contends that the errors raised in this appeal create cumulative error that entitles him to a new trial. However, the evidence is sufficient to support the Defendant's conviction, and the trial court did not err during the trial or the sentencing hearing. Without multiple errors, no cumulative error claim is possible. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
ROBERT H. MONTGOMERY, JR., JUDGE